Terance P. Perry, Esq.
DATSOPOULOS, MacDONALD & LIND, P.C.
201 West Main Street, Suite 201
Missoula, Montana 59802
Phone: (406) 728-0810
Fax: (406) 543-0134

Attorneys for Plaintiff

FILED MAR 0 9 2009
SHIRLEY E. FAUST, CLERK
By Richard Goodwin
Deputy

## MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

| | |
|---|---|
| SHERRIE SORENSON, an individual, <br><br> Plaintiff, <br><br> v. <br><br> PRAXAIR, INC., a Delaware corporation, and PRAXAIR HEALTHCARE SERVICES, INC., a Delaware corporation, <br><br> Defendants. | Cause No. DV-09-336 <br> Dept. No. DEPT. No. 3 <br> John W. Larson <br><br> COMPLAINT AND DEMAND FOR JURY TRIAL |

### FACTS COMMON TO ALL COUNTS

1. At all times relevant hereto the Plaintiff, Sherrie Sorenson, was a resident of the State of Montana with a principal place of residence located in Missoula, County of Missoula, Montana.

2. At all times relevant the Defendant, Praxair, Inc., was a Delaware corporation with a principal place of business located at 39 Old Ridgebury Road, Danbury, Connecticut.

3. At all times relevant the Defendant, Praxair Healthcare Services, Inc., was a Delaware corporation and a wholly owned subsidiary of the Defendant, Praxair, Inc., with a principal place of business also located at 39 Old Ridgebury Road, Danbury, Connecticut.

Complaint and Demand for Jury Trial    **EXHIBIT A**    1

4. At all times relevant, the Defendants, and each of them, transacted business in the state of Montana, entered into contracts and owned, use or possessed property within said state, entered into contracts for services to be rendered and materials to be furnished within said state, employed residents of said state and otherwise availed themselves of the rights and benefits of the state of Montana.

5. At all times relevant the Defendant, Praxair Healthcare Services, Inc. (hereinafter "PHS"), was involved in the marketing and sale of healthcare services and supplies throughout the United States.

6. During that period of time from on or about approximately October 1, 1990 through on or about May 21, 2001, the Plaintiff was employed by Interwest Medical Equipment Distributors, Inc., first as a respiratory therapist, then as Director of Training and Education and, finally, as the Corporate Compliance Officer, Director of Clinical Services, Regulatory Affairs, Human Resources.

7. On or about May 21, 2001, Interwest Medical Equipment Distributors, Inc. was purchased by the Defendant, PHS ("purchase").

8. After the purchase, the Plaintiff continued to work for the Defendant, PHS, as its Corporate Compliance Officer and Director of Clinical Services for the United States bearing principal responsibility for the creation and implementation of the compliance program for PHS nationwide insofar as it did not have in place such a program at the time of purchase.

9. The Plaintiff worked in the capacity as Corporate Compliance Officer and Director of Clinical Services for the United States as a PHS employee during that period of time from on or about May 21, 2001 to on or about May 2005 at which time Plaintiff became the Compliance Manager, reporting directly to the newly appointed Compliance Officer, Anna

Johnson.

10. During that period of time from on or about May 2005 through March 2008, the Plaintiff was employed by PHS as its Compliance and Privacy Manager, West U.S., and essentially maintained the same duties borne as the Corporate Compliance Officer sans the responsibility or accountability for reporting compliance and privacy activities to senior management.

11. During that period of time from on or about March 2008 through on or about November 2008, the Plaintiff reported to Peter Casazza, Vice President of Compliance and Safety at PHS.

12. During approximately March of 2008, while conducting a Medicaid fraud audit in the state of New York, Peter Casazza announced to the Plaintiff, and to others, that he had been appointed as their supervisor.

13. At the time that Mr. Casazza first announced that he would be Plaintiff's supervisor, he also indicated to the Plaintiff, and to others, that there would be changes within the department commencing with the hiring of approximately four to five new staff members in order to support the efforts of the compliance team.

14. On information and belief, at the time Mr. Casazza announced his appointment as Plaintiff's supervisor, he lacked any previous experience in the compliance, privacy, clinical and safety areas, having a background in information technology and project management.

15. During the project in New York, Mr. Casazza often appeared agitated, frequently utilized foul language, had a custom of throwing files and other documents and characteristically treated Plaintiff's former supervisor, Ms. Anna Johnson, in a demeaning manner.

Complaint and Demand for Jury Trial                                                                 3

16. During the project in New York, Mr. Casazza had frequent outbursts in the presence of the Plaintiff, stating that he "hated health care", that he needed Ms. Johnson and Plaintiff "on board" with him, to "trust him" and that if either of them could not comply with that request then they could both leave the employment of the Defendant, PHS; both Ms. Johnson and Plaintiff repeatedly stated to Mr. Casazza that they would do all they could to help him become successful in his new assignment at PHS.

17. During the ensuing months up to and including November 2008, Mr. Casazza increasingly evidenced disdain toward the Plaintiff, both on a personal and on a professional level.

18. During approximately late April to mid-May 2008, Mr. Casazza contacted the Plaintiff via telephone from his office in Danbury, Connecticut, and stated, in words or substance, that he had identified several candidates to fill the Compliance Field Representative positions as part of the enhancements to the department he had previously described and he also expressed his desire to move the Plaintiff into more of a research and web page design role on behalf of the Defendant, PHS. ("April discussion").

19. During the April discussion, Mr. Casazza stated to the Plaintiff that he needed her knowledge and expertise in the compliance and privacy areas in order to create training programs for the team to utilize as well as to create a communication website for all staff of the Defendant, PHS.

20. During the April discussion, Mr. Casazza informed the Plaintiff that, in his opinion, she was the most knowledgeable person on his team and that he needed to rely on her to provide him with relevant knowledge regarding compliance and privacy issues; the Plaintiff expressed her concerns during that conversation with regard to the proposed changes in the scope of her employment.

21. During the April discussion, the Plaintiff stated to Mr. Casazza that she did not believe that she was the most appropriate choice to create a computer web site insofar as she had no prior web design experience and, additionally, she stated to Mr. Casazza that her strongest assets were in training and education in light of her extensive employment history in those areas as well as her ability to hold relationships with staff.

22. During the course of the April discussion, Mr. Casazza stated that in Plaintiff's "new role" she would no longer have contact with staff at any of the branches and that the only training she would conduct would be with new team members.

23. During the April discussion, the Plaintiff voiced her concerns to Mr. Casazza regarding the dramatic changes in her job responsibilities which she viewed to be a demotion.

24. During the April discussion, Mr. Casazza indicated to the Plaintiff that she needed to trust him and that the Defendant, PHS, had authorized and fully supported him in hiring additional staff, stating also that no reductions in force or terminations were going to occur within his department.

25. During the April discussion, Mr. Casazza expressed to the Plaintiff that he wanted her to consider her new position as being a "linear" position and not as an advancement and the Plaintiff again expressed her concerns regarding this "new" position, clearly indicating to him that she wished to remain in her current position insofar as she was already quite familiar with all staff in the west and had long-term relationships that had already been established, to which he replied that field representatives must live in the cities where their regional billing centers were located since a portion of their duties would be working directly with the billing center managers and insofar as the Plaintiff resided in Montana, it was Mr. Casazza's opinion and decision that she could not continue in her current position

and that a new representative would need to reside in Salt Lake City, Utah.

26. During the April discussion, Mr. Casazza inquired of the Plaintiff regarding two candidates he had identified for Compliance Field Representative positions, with both of whom Plaintiff was familiar; when the identities of these individuals were revealed, the Plaintiff stated that neither candidate had any compliance or privacy experience but that they could certainly learn and would likely do a good job.

27. During the end of the April discussion, the Plaintiff requested that Mr. Casazza consider Ms. Johnson and herself for senior compliance positions in light of their extensive experience and training in the position and Plaintiff specifically requested that Mr. Casazza leave her title intact insofar as it was very important to her and, in her opinion, to her career and she did not want staff of Defendant, PHS, concluding that her change in position was a demotion; Mr. Casazza stated in words or substance that titles were no longer important and there would be no such designations for any of his team members.

28. Following the April discussion, the Plaintiff came to learn that Mr. Casazza had changed her job title to "Compliance Analyst" which constituted a position entailing significantly reduced job duties and responsibilities in stark contrast to Plaintiff's prior position with Defendant, PHS.

29. Prior to demoting the Plaintiff to "Compliance Analyst", Mr. Casazza had not informed her of this change in title.

30. During approximately May of 2008, Mr. Casazza hired additional Compliance Field Representatives on behalf of Defendant, PHS, and Plaintiff inquired of Mr. Casazza as to whether or not he would permit Ms. Johnson and herself to conduct a training session to welcome new staff and to provide a solid foundation for their new job responsibilities,

Complaint and Demand for Jury Trial                                                                 6

however, Mr. Casazza declined Plaintiff's request.

31. On or about June 23, 2008, Mr. Casazza held a Compliance Team meeting with the Plaintiff and new staff members again stating that senior management had authorized him to increase Compliance staff from two (Plaintiff and Ms. Johnson) to seven (7), and four (4) of the new staff members were present at this meeting.

32. Shortly after the June 23, 2008 meeting, the Plaintiff came to learn that one of the newly hired Compliance Team members whom Mr. Casazza had previously indicated would be required to move to Salt Lake City to be employed as a Field Representative servicing that city had, in fact, not been compelled to move to Salt Lake City.

33. During July of 2008 and while in Salt Lake City, Utah, on business for the Defendant, PHS, the Plaintiff received an urgent call from Mr. Casazza regarding a rehabilitation audit which had previously been conducted by the Plaintiff and Ms. Johnson indicating that reviewing consultants had determined that there were numerous flaws and inaccuracies in the audit reflecting nearly a 90% failure rate; Mr. Casazza was agitated, cursed during the course of the telephone call and implied that Ms. Johnson and the Plaintiff were incompetent.

34. During the course of the July 2008 telephone call, Mr. Casazza cancelled Plaintiff's then present job assignment to conduct a risk assessment in Salt Lake City and demanded that she review work already completed by herself and Ms. Johnson in order to ensure the error rate was not as high as the consultants had indicated and Plaintiff agreed to travel to the rehabilitation location to re-review the work previously completed.

35. Later that evening, the Plaintiff spoke with Ms. Johnson who indicated, in words or substance, that she had spoken with Mr. Casazza about the consultant's findings, that he was completely misinformed and that he had exaggerated the entire issue; the failure rate

Complaint and Demand for Jury Trial                                                                                     7

was nothing near what Mr. Casazza had previously claimed.

36. Thereafter, Mr. Casazza telephoned Plaintiff to confirm that the alleged failure rate was not nearly as high as he had indicated; he was calm during the telephone conversation and requested that Plaintiff continue with the previously planned risk assessment in Salt Lake City.

37. The Plaintiff later confirmed that the failure rate on the rehab audit was less than ten percent (10%) from a regulatory perspective which she confirmed upon her secondary review; Ms. Johnson and Plaintiff had solely been called upon to assess medical necessity and to verify that all required forms had been completed accurately and signed and neither had been requested to review pricing or coding by the entity insofar as these tasks had been assigned to the consultants and that is where the consultants had found their own errors and inconsistencies.

38. On July 22, 2008, the Plaintiff sent an e-mail to Mr. Casazza, as per his request, following a scheduled staff meeting in order to remind him of outstanding compliance issues that still needed to be resolved, as she had previously discussed with him when he first assumed duties as the Compliance Officer during March of 2008; the e-mail detailed the issue, level of priority and which team members should be involved in conducting the work, however, Mr. Casazza never responded to this e-mail.

39. On July 24, 2008, the Plaintiff attended her first meeting with information technology employees of the Defendant, PHS, in order to discuss the web design for the staff communication tool called Sharewaves, as previously requested by Mr. Casazza, and content, layout, site capabilities and appropriate limitations were discussed.

40. On July 25, 2008, the Plaintiff attended her second meeting with the Information Technology Department of the Defendant, PHS, to work on Sharewaves.

41. During the July and August 2008 time periods, Mr. Casazza continued to undertake efforts to reduce the scope of Plaintiff's job responsibilities as evidenced by his having assigned lead responsibility for a rehab chart review in Salt Lake City to the billing center manager rather than to the Plaintiff.

42. On August 25, 2008, Mr. Casazza assigned one of the new team members to the west rehab review function and removed Plaintiff from the project entirely; the new employee assigned to this project had no prior experience in this area and, on information and belief, had received no additional training that would have made her competent to perform functions inherent in the rehab review.

43. During September of 2008, Mr. Casazza continued to engage in conduct further reducing the scope of Plaintiff's job responsibilities at Defendant, PHS.

44. During the September 22, 2008 to September 26, 2008 time period, the Plaintiff attended a Compliance Team meeting in Danbury, Connecticut, at which time Mr. Casazza was in attendance. ("September meeting").

45. Mr. Casazza met with team members on the afternoon of September 24, 2008 in order to review work that had been completed and to discuss outcomes of the risk assessment which had been performed in Salt Lake City; the discussion began in a reasonable, respectful manner but quickly escalated into a shouting session and Mr. Casazza repeatedly cursed after he had asked for input from Plaintiff and Ms. Johnson.

46. As a result of Mr. Casazza's behavior during the September 24, 2008 team meeting, both Plaintiff and Ms. Johnson ceased participating in the discussion.

47. On the morning of September 25, 2008, the Plaintiff spoke with Mr. Casazza seeking to bring to his attention the increasing friction that existed amongst team members and the team's declining ability to communicate, re-iterating her desire to do all that was necessary to help him to build a successful team, that she was fully on board, but that it was becoming more difficult to function in a positive manner with the environment so negative and volatile.

48. During the course of the September 25, 2008 conversation, Mr. Casazza again re-iterated to the Plaintiff how valuable she was to him in light of her knowledge and experience and that he definitely needed her on board, stating however that Ms. Johnson and Plaintiff both seemed "arrogant" in their approach to the new team and that this was causing some of the friction; the Plaintiff took offense at this statement and was upset to hear it insofar as she had repeatedly offered to assist the new team members in any manner she could on numerous occasions and, in fact, had previously provided assistance to all four (4) of the new staff members on numerous occasions via both e-mail and telephone.

49. During the September 25, 2008 conversation, the Plaintiff informed Mr. Casazza that she was upset that he yelled and cursed at her with regularity and that it was not her fault that he hated health care, to which he responded, in words or substance, that he was angry and disappointed because he had worked and planned his career path to assume the Information Technology Director role for Praxair but that the President of the company had asked him to take the Compliance Officer position instead.

50. During this discussion, the Plaintiff also raised, for a second time, concerns she had with her position and her fear that it could be eliminated, to which Mr. Casazza replied that his entire team was safe and that he had authorization from the President to hire the staff

necessary and to "beef up" the Compliance Team.

51. During the September 25, 2008 conversation, Mr. Casazza stated, in words or substance, that his team would not be subject to potential cutbacks in staff and that his was one of the few that was safe.

52. During October 2008, Mr. Casazza assigned the responsibility for preparing quarterly audit summaries to a Compliance Field Representative; since approximately 2003, this had been a duty performed by the Plaintiff, it was a process with which the Plaintiff was extremely familiar and, in fact, it was the Plaintiff who had created the initial reporting tool necessary to perform the quarterly audit summaries.

53. During the late summer and fall of 2008, the Plaintiff continued to work with the Information Technology Department at Defendant, PHS, as Mr. Casazza had previously directed.

54. On October 3, 2008, Mr. Casazza telephoned the Plaintiff regarding a letter she had prepared on behalf of a fellow employee who had fallen ill and, during the course of the conversation, Mr. Casazza thanked the Plaintiff for her having performed this task, calling her back later that same day, however, in order to yell at her and to curse about how much he hated health care and, essentially, his position with the Defendant, PHS.

55. On October 31, 2008, the Plaintiff met with Mr. Casazza in order to discuss her work on the Sharewaves process.

56. On November 4, 2008, the Plaintiff flew to Salt Lake City in order to assist her team with conducting a regional billing center audit however, upon her arrival, she was informed by Ms. Johnson that the sample size had not yet been determined by Mr. Casazza and, thus, no charts had been pulled and the team was unable to perform any audit work.

Complaint and Demand for Jury Trial                                            11

57. On November 4, 2008, Plaintiff's fellow team members who were present in Salt Lake City commented about the lack of direction from Mr. Casazza and some expressed their irritation insofar as his having failed to determine the sample size had resulted in the teams' inability to perform the billing center audit in an efficient manner.

58. By Wednesday, November 5, 2008, Mr. Casazza had still yet to determine the sample size for the regional billing center audit in Salt Lake City.

59. On November 7, 2008, the Plaintiff voiced her concerns to Mr. Casazza regarding the breakdown in communications amongst the team members and that, in her opinion, the work environment was becoming hostile, to which Mr. Casazza expressed his disagreement.

60. During the course of the November 7, 2008 conversation, the Plaintiff stated to Mr. Casazza that she felt it important to share her concerns out of respect for him as her supervisor and that she would always give him an honest perspective, since honesty and ethics were core values to her, to which he responded that she was one of the most honest people he knew.

61. During the course of the November 7, 2008 conversation, Mr. Casazza informed the Plaintiff that he was going to make some "significant changes" to which she inquired as to whether or not those changes involved her; Mr. Casazza responded that they did.

62. Plaintiff inquired of Mr. Casazza as to whether or not he was eliminating her position and he responded "Yes" and the Plaintiff requested that Mr. Casazza bring in the Human Resources Manager; Mr. Casazza then brought in Mr. Elmond Tolbert who stated that the Defendant, PHS, had eliminated her position and that it was by no means performance based; the Plaintiff asked Mr. Tolbert how the Defendant, PHS, could eliminate her

position when four (4) other people had been so recently hired and in light of the fact that she had been an employee for eighteen (18) years and Mr. Tolbert again stated that the decision to terminate her employment had not at all been predicated upon her performance but was a reduction.

63. Immediately after the November 7, 2008 conversation, the Plaintiff gathered her belongings and left Defendant's, PHS's, facility, returning to Montana on the next available flight.

64. Prior to her termination on November 7, 2008, the Plaintiff had received no verbal or written warnings from the Defendant, PHS.

65. From on or about July 2003 to the date of her termination by Defendants, Plaintiff worked on behalf of the Defendants, and each of them, from her residence located in Missoula, Montana.

66. During the entire course of her employment by Defendant, PHS, said Defendant forwarded paychecks to her in Missoula, Montana.

67. At all times relevant, the Plaintiff acted within the scope of her employment pursuant to and under the auspices, direction and control of her immediate supervisor Peter Casazza.

68. During that period of time from and including May 21, 2001 through and including November 7, 2008, Plaintiff performed her job responsibilities on behalf of Defendant, PHS, in a manner wholly consistent with all relevant policies, protocols and procedures in place at said Defendant as well as training, supervision and guidance Plaintiff had received from more senior employees including, but not limited to, Peter Casazza.

69. On information and belief, Plaintiff's employment with Defendant, PHS, was not terminated as a proximate consequence of any reduction in work force.

70. At all times relevant hereto, the Defendant, Praxair, Inc., was licensed to do business in and was engaged in business in the state of Montana.

71. At all times relevant hereto, the Defendant, PHS, was a mere instrumentality of its parent corporation, the Defendant, Praxair, Inc.

72. At all times relevant hereto, the Defendant, Praxair, Inc., exercised actual control over Defendant, PHS.

73. At all times relevant hereto, the Defendant, Praxair, Inc., filed consolidated statements of income, condensed balance sheets, condensed consolidated statements of cash flow and consolidated statements of shareholder equity with the Securities and Exchange Commission which included revenue from and obligations of Defendant, PHS.

74. At all times relevant hereto, those individuals exercising operational control over Defendant, PHS, did so for the benefit and in furtherance of the interests of its parent corporation, the Defendant, Praxair, Inc.

75. On information and belief, Defendant, Praxair, Inc., underwrote the incorporation and purchase of all of the capital stock of its wholly owned subsidiary, the Defendant, PHS.

76. On information and belief, the Defendants share a joint accounting and payroll system.

77. The Defendants share the same address as their principal place of business, 39 Old Ridgebury Road, Danbury, Connecticut.

78. At all times relevant, Defendant, Praxair, Inc., exercised dominion and control over Defendant, PHS.

79. At all times relevant, the Defendant, PHS, was a mere agent of Defendant, Praxair, Inc., the latter of which exercised control over the conduct and activities of its wholly owned subsidiary, the Defendant, PHS, so that, in effect, the Defendant, PHS, was merely acting

on behalf of its parent, the Defendant, Praxair, Inc.

80. At all times relevant, the Defendant, PHS, was the alter ego of Defendant, Praxair, Inc., insofar as the corporate affairs of both were so interrelated and intertwined that, in effect, each no longer had a separate identity.

81. At all times relevant, the Defendant, Praxair, Inc., maintained a website that provided information regarding Defendant, PHS, but which failed to distinguish said Defendant from its parent, the Defendant, Praxair, Inc., and which would lead any reasonable person to conclude that Defendant, PHS, was part of, indistinguishable from and directed and controlled by Defendant, Praxair, Inc.

82. The Defendant, Praxair, Inc., is liable to Plaintiff for Defendant's, PHS's, tortious conduct toward Plaintiff.

## COUNT I: WRONGFUL DISCHARGE §39-2-901, M.C.A. et. seq.
### (as to Defendants Praxair, Inc. and Praxair Healthcare Services, Inc.)

83. Comes now the Plaintiff, Sherrie Sorenson, and realleges and reaffirms all allegations contained in Paragraphs one (1) through eighty-two (82) above as if fully set forth herein.

84. At all times relevant while employed by Defendant, PHS, Plaintiff performed her job consistent with and pursuant to training received and policies, protocols and procedures in place at said Defendant as well as directives and supervision received from more senior employees of Defendant, including, but not limited to, Peter Casazza.

85. On November 7, 2008, Plaintiff was terminated from her employment by Defendant, PHS, on pretextual, false and fraudulent bases.

86. Defendant, PHS, did not discharge Plaintiff for good cause.

87. In discharging Plaintiff, Defendant, PHS, violated the express provisions of its own written personnel policy.

88. In discharging Plaintiff, Defendant, PHS, violated its own unwritten policies and practices regarding employee discipline and termination.

89. Plaintiff's discharge was wrongful insofar as it was pretextual in nature, not predicated on good cause and since Defendant's, PHS's, conduct was motivated by ulterior motives which were wholly unrelated to Plaintiff's job performance.

90. The reason provided by Defendant for Plaintiff's termination was false and wholly lacked any basis in fact.

91. In having discharged Plaintiff, Defendant, PHS, engaged in actual fraud and acted with actual malice.

92. At the time of Plaintiff's discharge, she was not a probationary employee.

93. As a direct, immediate and proximate consequence of Defendant's, PHS's, wrongful discharge of Plaintiff, Plaintiff has incurred direct and consequential damages including, but not limited to, lost wages, costs and expenses associated with seeking new employment, lost health and dental insurance benefits and related costs and expenses, all to her great damage.

94. As a direct, immediate and proximate consequence of Defendant's, PHS's, wrongful discharge of Plaintiff, Plaintiff has sustained the loss of valuable and extensive fringe benefits including, but not limited to, life insurance benefits, long term disability coverage, use of a cellular phone and laptop, vested participation in Defendant's, PHS's, 401(k) profit sharing plan, it's employee stock purchase benefit plan and it's educational assistance plan, bonuses, salary increases, paid vacation and personal days and other valuable fringe benefits, all to her great damage.

WHEREFORE, Plaintiff, Sherrie Sorenson, demands judgment against Defendants, Praxair, Inc. and Praxair Healthcare Services, Inc., jointly and severally, for:

a. Compensatory damages including, but not limited to, lost wages and fringe benefits;

b. Interest;

c. Costs;

d. Expenses;

e. Attorney's fees; and

f. For such other and further relief as this Honorable Court deems meet and just.

### JURY DEMAND

The Plaintiff, Sherrie Sorenson, demands a trial by jury on all issues to triable.

DATED this 9th day of March, 2009.

DATSOPOULOS, MacDONALD & LIND, P.C.
Attorneys for Plaintiff

By: _____
Terance P. Perry, Esq.

Complaint and Demand for Jury Trial                                                                 17